IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**RICHARD ROGALINSKI,** Individually
and on Behalf of the Class,
    Plaintiffs

**Case No.:**

**Division:**

-vs-

**FACEBOOK, INC.**, a Foreign Corporation,
    Defendant

_____/

**CLASS ACTION COMPLAINT FOR FIST AMENDMENT VIOLATIONS**
Jury Trial Requested

The Plaintiffs, RICHARD ROGALINSKI, individually and on behalf of the Putative Class Members, hereby sues the Defendant, Facebook, Inc., upon the grounds set forth herein, and based upon the knowledge and information of the Plaintiff, the Putative Class Members, and the information available to their counsel.

## BACKGROUND

1. If ever there were a keystone in the systemic-structure of the United States Government, a single component which conferred a quintessential quality to the American people and the history of the world's longest-lived continuous democratic republic, it is the First Amendment to the United States Constitution.

2. This forty-five-word statement grants its constituents the right to free speech (amongst other things) and is the heart and soul of American culture. The foundation for our political system of governance can most significantly be attributed to this amendment, and a credible argument can be made that its implementation has been the most consequential factor in the longevity of the country. Indeed, it is the underpinnings for our creativity, scientific achievements, and cultural evolution.

3. When this "great bulwark of liberty" was crafted by the House and Senate in 1789, it was well understood to be of the utmost importance to the fledgling republic for its ability to keep the federal government from trampling upon the liberty of its constituents – and more importantly, to prevent the imposition of a dogmatic national narrative, as had been exercised over the then-contemporary populace by the British crown and church.

4. The drafters' concerns for the protection of free speech proved prescient over the ensuing centuries. Other democracies which failed to protect the free speech rights of their populace, perhaps none more memorably than that of the German Weimar Republic, fell to authoritarianism, dictatorship, and systemic collapse.

5. In our nation, however, the judiciary has proven to be the vanguard of the right to free speech. More than two-centuries of case law has shown Congress and the executive branch content to abridge the right from time to time, only to be held in check by the courts. Through the civil war, two world wars, a severe depression, the civil rights movement, and the cold war, the right to free speech has thrived and grown.

6. As the right to free speech developed over the centuries, the venues for such right have evolved as well. Originally exercised on soapboxes in town squares and marketplaces, free speech rights have carried over to radio and television broadcasts, expanded past city limits to suburban venues such as malls and schools, and taken root in such subtle locations as vehicle license plates.

7. Ultimately, the soapbox, town square and to a lesser degree, the common marketplace, went the way of the horse and the 8-track. Gone are the common forums provided by these public venues, especially as modern retailers like Amazon and Walmart shift

away from in person sales and rely more significantly on their customer's internet connectivity.

8. In the demise of the antiquated venues for public expression and discourse, new digital public forums grew to replace them. Software companies like the Defendant, Facebook, opened their doors to create such a public, commonly accessed venue. Much like their predecessors, these digital venues are open to members of the public, such as the Plaintiffs, and the proprietors derive their income from advertising to their attendees and facilitating sales between third party merchants and the potential customers who attend the venue.

9. For more than two-decades, the Defendant has been at or near the forefront of the new digital public forum. As we sit in 2021, the Facebook has wholly rebuilt the antiquated town square and marketplace in its own image, providing its attendees with both a digitized marketplace (the "Facebook Marketplace") and a digitized public forum for discourse.

10. The Defendant's function and services in modern times is identical to that of the public forums originally contemplated by Congress when the First Amendment was crafted, and subsequently passed by the nation.

### THE FIRST GLOBAL PANDEMIC OF THE POSTMODERN DIGITAL AGE

11. The onset of 2019 Novel Coronavirus (COVID-19) in the latter months of 2019 presented the first world-wide pandemic of the postmodern digital age. Though the United States had weathered pandemics before, it had been at least sixty (60) years since the last one, and slightly more than a hundred years since the most well-known pandemic of the Late-Modern Era: the Spanish Flu.

12. Scientific and lay theories regarding the virus' origin, infection prevention and treatment methods were immediately plentiful. The topic dominated the news-cycle to the exclusion of virtually all other subjects for months.

13. Subsequent state and municipal government shutdowns of public areas, private businesses and schools, in addition to strict prohibitions against gathering and social activities, drove the entirety of public discourse on the topic (include that of the Plaintiffs) to the last bastions of public forum: internet based social-media offered by the Defendant, Facebook, and less than a handful of other platforms.

14. With this sudden concentration of discourse under its moderation, the Defendant had newfound and immense power to control the content and direction of the public conversation through the modification, redaction and labelling of statements made by its public users, including those of the Plaintiffs.

15. All the while, the scientific community reeled from the speed at which the COVID-19 pandemic swept the world, often debating widely and publicly about the origin, methods of transmission, symptoms and treatments for the disease.

16. Memorably, even the U.S. Center for Disease Control and Prevention (CDC) seemed to lack a consistent message to the public regarding proper precautions, as guidance from the CDC as late as March, 2020 stated that wearing masks was unnecessary for healthy individuals.

17. Weeks later, the CDC reversed its position saying that masks were absolutely necessary. Mask mandates issued by the Federal, state and municipal governments sprang up virtually overnight thereafter.

18. Whether accurate or not (a subject of no small scholarly debate even at the date of filing of this Complaint), pressure began to mount on the Defendant to begin filtering, curating, labelling or outright censoring publicly posted comments and statements deemed to contain "misinformation" about the still widely debated attributes of the virus.

19. Despite an ever-changing and incomplete landscape of research findings, anecdotal evidence and scientific theories, the Defendant formed a dogmatic narrative about COVID-19 and its vaccinations.

20. In February 2021, the month following the inauguration of President Joseph (Joe) Biden and his administration, the Defendant acknowledged that it had begun to "crack down" on public statements and comments made by participants on its public forum.

21. Some of the information the Defendant specifically began to censor included, but was not limited to: (1) statements that the origin of COVID-19 was man made; (2) statements casting doubt as to the efficacy of the vaccines; (3) statements casting doubt upon the safety of the vaccinations; and (4) statements pertaining to relative danger of the virus itself.

22. On July 15th, 2021, United States President Joe Biden's Press Secretary, Ms. Jennifer Psaki, brought to light that the Defendant's efforts to censor information had come in communion with, if not at the behest of efforts by the Executive Branch of the Federal Government to restrict public statements and comments which clashed with the dogmatic narrative adopted by the new administration and Facebook:

> "*Q*:  Can you talk a little bit more about this request for tech companies to be more aggressive in policing misinformation?  Has the administration been in touch with any of these companies and are there any actions that the

>federal government can take to ensure their cooperation, because we've seen, from the start, there's not a lot of action on some of these platforms.
>
>*Ms. Psaki:* Sure.  Well, first, we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic.
>
>In terms of actions, Alex, that we have taken – or we're working to take, I should say – from the federal government: We've increased disinformation research and tracking within the Surgeon General's office.  ***We're flagging problematic posts for Facebook that spread disinformation***.  We're working with doctors and medical professionals to connect – to connect medical experts with popular – with popular – who are popular with their audiences with – with accurate information and boost trusted content so we're helping get trusted content out there…
>
>There are also proposed changes that we have made to social media platforms including Facebook, and those specifically are four key steps.
>
>One, that they measure and publicly share the impact of misinformation on their platform.  Facebook should provide, publicly and transparently, data on the reach of COVID-19 – COVID vaccine misinformation…
>
>Second, that we have recommended – proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules…
>
>Third, it's important to take faster action against harmful posts.  As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate.  And Facebook needs to move more quickly to remove harmful, violative posts – posts that will be within their policies for removal often remain up for days.  That's too long.  The information spreads too quickly.
>
>Finally, we have proposed they promote quality information sources in their feed algorithm.  Facebook has repeatedly shown that they have the levers to promote quality information.  We've seem them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case." See Exhibit A attached hereto.  Emphasis added.

23. The Plaintiffs have made public statements regarding COVID-19 on the Defendant's public forum platform, which were censored by the Defendant because the statements were inconsistent with the interests of the Government.  Many of the Plaintiffs'

statements which were censored by the Defendant have subsequently been broadly accepted as likely factually accurate, despite their prior designation as misinformation.

24. Furthermore, these public statements and comments made by the Plaintiffs were made as part of their rights to free speech.

## Jurisdiction and Venue

25. This Court has jurisdiction over the subject matter of this action pursuant to the 1st Amendment of the United States Constitution, in addition to 28 U.S.C. §1331, 1332, and 28 U.S.C. §§2201-2202.

26. With respect to the Class Action components of this matter, jurisdiction is proper before this Court in accordance with 28 U.S.C. §1332(d) as the proposed class consists of over one-million Members; the Members of the proposed class, including the Plaintiff, are citizens of states different from the Defendant's home state; and the aggregate amount in controversy exceeds $5,000,000.

27. Venue is proper in the Middle District of Florida under 28 U.S.C. §1391(b)(2), (d) and (e)(1). A substantial part of the events giving rise to this claim occurred within the Middle District of the State of Florida.

## Parties

28. Plaintiff Richard Rogalinski is a natural person domiciled in the Middle District of Florida.

29. The Plaintiff Class Members ("Putative Class Members") include individuals who have resided within the United States between January 20th, 2021 and the present, and had their statements or comments on Facebook regarding COVID-19 censored by the Defendant, and were damaged thereby.

30. Defendant Facebook, Inc., is a foreign corporation with a principal place of business at 1601 Willow Road, Menlo Park, California, and conducts business throughout the world, including within the State of Florida and the remainder of the United States.

**Statement of Facts:**

31. As part of its operation of the public forum it has created, Facebook has developed a number of tools that it utilizes to remove, hide, censor, append or alter statements (hereinafter "Censorship Tools") made by participants registered with the company.

32. It regularly uses these Censorship Tools to moderate public and private conversations on its platforms, including Facebook and Instagram.

33. The Federal Government, as discussed above, has admitted that it provides instructions to the Defendant regarding which accounts and which statements it finds to contain COVID-19 information inconsistent with its dogmatic narrative. The Federal Government further acknowledged that the Defendant follows these instructions and utilizes its Censorship Tools against the persons identified by the Federal Government.

34. At the direction of the President of the United States, his highest levels of staff members, and other Federal Government agencies and officials, the Defendant has engaged in a course of conduct to censor, limit and otherwise chill the Plaintiffs rights to free speech as they pertain to COVID-19.

35. These statements by the Plaintiffs were expressions of their beliefs regarding healthcare and politics as they pertain to COVID-19 and were intended and offered to further public discourse.

36. Accordingly, these statements are afforded protection as free speech under the First Amendment of the United States Constitution.

37. Examples of such censorship and chilling of free speech include, but are not limited to the following:

   a. On or about April 6th, 2021, Plaintiff Rogalinski, a participant on the Defendant's social media platform, posted a comment to his page discussing the utilization of masks and facial coverings to prevent the spread of COVID-19.

   > "Some of that science stuff laying out how masks do nothing to prevent the spread of [COVID-19] and they're actually harmful to your health. Haven't seen any of that science stuff saying otherwise. Just talking heads who want to spread fear and control you." Exhibit B.

   b. The Defendant, in response, appended a statement to Plaintiff Rogalinski post:

   > "NCBI.NLM.NIH.GOV (*i*)
   > www.ncbi.nlm.nih.gov
   >
   > Missing Context. Independent fact-checkers say this information could mislead people. See Why."

   c. Weeks later, on May 6th, 2021, Plaintiff Rogalinski posted another COVID-19 related comment to his page, this time raising issues with COVID-19 vaccines and citing an article from Fox News's Tucker Carlson regarding how many Americans had died after taking the COVID vaccine. Exhibit C.

   d. The Defendant appended the Plaintiff's statement with its own: "Missing Context. Independent fact-checkers say this information could mislead people. See Why."

   e. On June 13th, 2021, Plaintiff Rogalinski posted an image of a Tweet (a statement made via Twitter) by Dr. David Samadi, a board certified urologist

  and Director of Men's Health at St. Francis Hospital in Roslyin, NY. The content of the Plaintiffs statement included the language in the tweet:

> "I want to ensure that everyone understands the gravity of the situation here. Hydroxychloroquine worked this whole time.
> The media said it would literally kill you if you took it simply because POTUS promoted it as a cure.." Exhibit D

 f. The Defendant hid the post from public view, labelling it "False Information" and then cited a USA Today article from nearly a year earlier (July 21st, 2020), indicating that the drug Hydroxychloroquine was an ineffective treatment for COVID-19.

38. Furthermore, Putative Members of the Class also exercised the First Amendment rights pertaining to beliefs and statements regarding COVID-19 in order to engage in the public discourse hosted on the public forum operated by the Defendant, Facebook.

39. The COVID-19 statements of Putative Members of the Class were censored, or their statements made immediate subject of rebuke or discredit from the Defendant at the behest of the Federal Government.

40. Such action by the Defendant had a chilling effect upon the Putative Class Members' future statements, or otherwise censored speech entitled to protections under the First Amendment.

41. Furthermore, the Defendant's actions against the Putative Class Members' statements amounted to unconstitutional censoring of speech entitled to protections under the First Amendment.

**Facebook: A State Actor**

42. The constitutional guarantee of free speech is a guarantee only against abridgement by federal or state government. *Hudgens vs. NLRB*, 424 U.S. 507, 513 (1976).

43. For purposes of stating a valid First Amendment claim against a private entity (rather than a governmental one), a claimant must demonstrate that there is a sufficiently close nexus between the Government and the challenged action of the private entity so that the action of the private entity may be fairly treated as that of the State itself. *Jackson vs. Metro. Edison Co.,* 419 U.S. 345, 351 (1974).

44. It is without dispute that typically facilities or locations that are deemed to be public forums are usually operated by governments, and those spaces in the post-modern era have increasingly become within the digital domain of the internet.

45. The Defendant, as noted by the Supreme Court in *Packingham vs. North Carolina*, 137 S.Ct. 1730, 1735 (2017), is one of the most popular sites where the exchange of views and speech occurs.

46. This was exacerbated by COVID-19's impact upon the non-digital societal outlets that were previously permissible. Curfews, gathering in groups, religious activity, and political activities were all either curbed or outright verboten by various municipal government fiat, thereby increasing the importance of the public's access to sites like the Defendant's.

47. The Supreme Court's commentary in *Packingham* seems to acknowledge the eventuality that we have arrived at: social media companies such as the Defendant have become an integral and necessary component of the public forum whereby Americans express their rights to freedom of speech.

48. This is indeed the product of social media's own intentions, albeit one with consequences.

49. For purposes of the instant case, the Defendant generally serves a governmental function in providing the public forum for their participants, such as the Plaintiffs in this matter, to exchange ideas and information freely.

50. However, the Defendant is not automatically a "state actor" just based upon the provision of their social media networks to the public. See *Freedom Watch, Inc., vs. Google, Inc.*, 386 F.Supp3d 30, 40 (D.D.C. 2019), citing *Lloyd Corp. vs. Tanner*, 407 U.S. 551, 569 (1972) ("nor does property lose its private character merely because the public is generally invited to use it for designated purposes.")

51. The transformative circumstances which must be present to change the Defendant's actions from those of a private entity to those of a state actor involve the presence of governmental authority conferred upon the private entity.

52. In the instant case, the President of the United States, and his retinue, have specifically instructed the Defendant to flag and censor specific statements made by the Plaintiffs, labelling them false, misleading or otherwise casting doubt upon the credibility because they are deemed to be "misinformation" by the Administration.

53. Such action is governmental in nature by its very definition: it is the executive branch issuing edicts and instructions to a private entity operating a public forum on how to moderate the public space.

54. In short, the action by the Administration has all but eliminated the private elements of decision making by the Defendant, and conferred by specific directive obligations upon the Defendant in the regulation of free speech.

55. Thereby, the Defendant became a State Actor as soon as it began accepting specific directives issued by the Governmental Administration.

56. Furthermore, the specific actions compelled by the Government and executed by the Defendant were flatly unlawful as the Government may not suppress lawful speech, even as a means to suppress unlawful speech. *Ashcroft vs. Free Speech Coalition*, 535 U.S. 234, 255 (2002).

## Class Action Allegations

57. The Plaintiff and the Class bring this lawsuit pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class (hereafter the "Class"):

    *All Facebook platform Members, Users or Participants who reside within the United States, and between January 20th, 2021 and today, had their public statements, comments or posts on the Facebook platform censored, modified, hidden, appended or curtailed by the Defendant, and where were damaged thereby.*

58. Subject to such other information as may be discovered through the course of this litigation and discovery, the definition of the Class may be expanded or narrowed by amendment or amended complaint.

59. Specifically excluded from the Class are the Defendant, its officers, directors, agents, trustees, parents, children, subsidiaries, trusts, representatives, employees, principals, servants, partners, joint venturers, or any entities controlled by the Defendant, and its heirs, successors, assigns or other persons or entities related to or affiliated with the Defendant and/or its officers and/or directors, in addition to the judge assigned to this

action, and any member of the judge's immediate family, as well as any magistrates assigned to this action, judicial law clerks or other members of the court's immediate staff.

60. <u>Numerosity</u>: The Members of the Class are so numerous that individual jointer is impractical. Upon information and belief, Plaintiff Rogalinski and the Class alleges that the Class contains hundreds of thousands, if not millions of Members. Although the precise number of Putative Class Members is unknown to the Plaintiff and the class, the true number of Putative Class Members is known by the Defendant, and thus, may be notified of the pendency of this action by first class mail, electronic mail, social media, and/or published notice.

61. <u>Existence and Predominance of Common Questions of Law and Fact</u>: Common quests of law and fact exist as to all Members of the Class and predominate over any questions affecting only individual Putative Class Members. These common legal and factual questions include, but are not limited to the following:

    a. Whether the Defendant's conduct violated the First Amendment of the United States Constitution.

62. <u>Typicality</u>: Plaintiff Rogalinski and the Class's claims are typical of the claims of other Members of the Class in that the Defendant, with the authority and direction from the Office of the President of the United States, censored, appended, modified, or hid protected speech on its platform, and otherwise acted to chill the Plaintiff and Class's rights to free speech upon the public forum operated by the Defendant.

63. <u>Adequacy of Representation:</u> Plaintiff Rogalinski and the Class will fairly and adequately protect the interests of the Class. Plaintiff and the Class have retained

counsel experienced in complex litigation, and the Plaintiff and the Class intend to vigorously prosecute this action. Further, Plaintiff and the Class have had no interests that are antagonistic to those of the Class.

64. <u>Superiority:</u> A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Putative Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendant. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if the Putative Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised in this lawsuit. Conversely, the class action litigation form provides the benefits of adjudication of the issues in a single proceeding, economies of scale, and comprehensive supervision by a single court and presents no unusual management difficulties under the circumstances here.

65. <u>Other Grounds for Certification:</u> The Class may also be certified because:

    a. The prosecution of separate actions by individual Putative Class Members would create a risk of inconsistent or varying adjudication with respect to individual Putative Class Members that would establish incompatible standards of conduct for the Defendant;

    b. The prosecution of separate actions by individual putative Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Putative Class Members not parties to the adjudications, or substantially impair or impeded their ability to protect their interests; and/or

    c. The Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive relief with respect to the Members of the Class as a whole.

## COUNT I: VIOLATION OF FIRST AMENDMENT RIGHT TO FREE SPEECH

66. Plaintiffs incorporate by reference all preceding paragraphs.

67. Under the Free Speech Clause of the First Amendment to the United States Constitution, exists the right to exercise free and unabridged speech to which the Plaintiffs are entitled.

68. Plaintiff Rogalinski and the Putative Class Members are users and account holders and participants in the Defendant's social media platform, including the platform known generally as Facebook.

69. Facebook serves to provide a public forum for users/participants to communicate the exchange of ideas and information for public consumption. These messages can generally be viewed by or shared with anyone on the internet, including other members of the public or specific subsections thereof, based upon the participant's preferences.

70. Plaintiffs utilized Facebook for its intended purpose: namely to express their views publicly on a regular basis.

71. Some of these views and statements expressed by the Plaintiffs involved information, discussions and debates regarding the numerous facets of the COVID-19 pandemic.

72. Included in these statements were comments on the origin of the COVID-19 pandemic, its transmission, prevention and treatment options, and general political comments regarding enforcement thereof.

73. At the direction of the Federal Government, or in communion therewith, Facebook flagged Plaintiffs' posts dealing with the aforementioned subjections by redacting, hiding, removing or appending additional information onto the messages.

74. Such actions were intended to censor information which the Government had termed "misinformation," and specifically intended to control the course of public opinion by removing objectionable material or otherwise casting aspersions upon the statements themselves.

75. This censorship, modification, redaction or abridgment caused Plaintiffs' posts to be difficult or impossible to view in the public forum either by erasure and concealment by Facebooks Censorship Tools.

76. The posts, statements and comments were directly impacted as well, either through covering Plaintiffs' posts so that individuals had difficulty viewing Plaintiffs' posts, or by appending statements to tell a reader that the Plaintiffs' public statements were false or otherwise invalid.

77. According to the Administration of President Joe Biden, the United States Government specifically indicated what users, content and information what should be flagged, censored, and removed regarding the COVID-19 virus.

78. Facebook subsequently engaged in the censorship directed by the Federal Government, causing its activities to be converted to that of a state actor.

79. Therefore, Facebook's actions were that of a governmental actor, and thereby are subject to the restrictions set forth in the First Amendment.

80. The government's actions by telling Facebook what to censor, modify or remove on their website related to COVID-19 directly caused the injury to Plaintiffs' First Amendment right to engage in political speech.

81. One of the most important uses to the First Amendment's right to engage in political speech is to engage in dissident views from the government.

82. The Defendant's actions to block Plaintiffs' views or state that such views were "misinformation," false or otherwise inaccurate, their activity was tantamount to disfavoring dissident speech in favor of the acceptable dogmatic information approved by the Government.

83. Absent injunctive and declaratory relief against Defendant Facebook, the Plaintiffs continue to be irreparably harmed as the Defendant continues to censor their protected speech.

84. The Plaintiffs demand a Jury Trial.

WHEREFORE, the Plaintiffs, Richard Rogalinski, and the Putative Class Members, respectfully request this Honorable Court enter Judgment against the Defendant, declaring such censorship to be unconstitutional under the First Amendment, enjoining them from future restrictions on the Plaintiffs free speech as it pertains to COVID-19, awarding the Plaintiffs their attorney's fees and costs, and for compensation of such other damages resulting from the

Defendant's unconstitutional activity which the Court deems just and proper under the circumstances.

Dated: July 19th, 2021               **Respectfully Submitted:**

*Andrew Z. Tapp*
Andrew Z. Tapp, Esq.
Florida Bar No.: 68002
Metropolitan Law Group, PLLC
1971 W. Lumsden Road, #326
Brandon, Florida 33511
(813) 228-0658
Andrew@Metropolitan.Legal
LaJeana@Metropolitan.Legal